# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

GILLES K. KOUASSI,                )
                                  )
    Plaintiff,                   )
                                  )
       v.                      )          Case No.   13-cv-1265
                                  )
WESTERN ILLINOIS UNIVERSITY,      )
    Defendant.                   )

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendant's Motion for Summary Judgment and Plaintiff's motion to strike his deposition transcript. (Docs. 66, 81). Both motions are fully briefed and ready for decision. For the reasons discussed below, Defendant's motion is granted and Plaintiff's motion is denied.

### SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir.

2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## PROCEDURAL HISTORY

This lawsuit emerges from the way in which Dr. Gilles Kouassi was evaluated by Western Illinois University during his promotion from Assistant Professor to Associate Professor of Chemistry, during his failed application for tenure, and during applications for two Professional Achievement Awards. Dr. Kouassi also points to repeated other instances of mistreatment that he believes he suffered while employed by WIU.

Plaintiff filed his original complaint on June 10, 2013. (Doc. 1). At that time, he was represented by counsel. On December 18, 2013, while still represented by the same attorney, Dr. Kouassi filed his First Amended Complaint. (Doc. 18). Shortly thereafter, the relationship between Dr. Kouassi and his first attorney appears to have deteriorated. On December 26, 2013, Dr. Kouassi wrote Judge Gorman, who was then the presiding Magistrate Judge in the matter, and asked that the case be stayed so he could find a new attorney. (Doc. 22). In a January 31, 2014 minute entry, the Court granted Dr. Kouassi's motion to terminate his first attorney. On February 26, 2014, Dr. Kouassi's second attorney filed an appearance.

(Doc. 25). Dr. Kouassi then filed a second amended complaint on April 22, 2014. As with his first attorney, their relationship deteriorated. On August 25, 2014, the second attorney – at Dr. Kouassi's request – filed with the Court a motion to withdraw (Doc. 41), which Magistrate Judge Hawley granted on the same day.

From that point forward, Dr. Kouassi has proceeded pro se. On October 23, 2014, he filed his third, and final, amended complaint, which brought claims against Defendants Western Illinois University, Rose McConnell, and Susan Martinelli-Fernandez. (Doc. 46). On February 4, 2015, the Court dismissed Counts V, VI, VII, and VIII from the Third Amended Complaint. This order had the effect of terminating Rose McConnell and Susan Martinelli-Fernandez as defendants. (Doc. 61).

Defendant Western Illinois University has moved for summary judgment on all of the remaining claims, which include: a Title VII claim for discrimination on the basis of race and color (Count I); a Title VII claim for discrimination on the basis of national origin (Count II); Title VII claims for retaliation (Count III and IX); a claim brought under 42 U.S.C. § 1981 (Count IV);  and a claim based on National Origin Discrimination and Retaliation (Count X).

INITIAL MATTERS

Before proceeding to Dr. Kouassi's claims for relief, the Court must take care of two initial matters. First, Dr. Kouassi has issued a blanket objection to the use of his deposition testimony, and has also moved to strike the deposition transcript. Second, Dr. Kouassi has presented a number of factual assertions that are not supported by evidence in the record. Before moving forward, the Court wishes to

explain for Dr. Kouassi's benefit the reasons that it must disregard many of his factual assertions.

## I. Disputes over Dr. Kouassi's Deposition

In his motion to strike his deposition transcript, Dr. Kouassi argues that "the large majority of the responses he gave during the deposition was forged, transformed, or misrepresented." (Doc. 81 at 4). He asserts that he wrote to Defendant's counsel on March 4 and 5 and requested corrections in order to "reinstate the true deposition," but did not receive a response to either letter. (*Id.*). Based upon this, Plaintiff accuses Defendant of forging the transcript of his deposition. He argues that "a forged and falsified transcript of deposition in a legal procedure is a scandalous matter," and asks the Court to "prevent any use of the forged transcript of deposition which remained without Plaintiff's signature," because "it does not represent Plaintiff's true responses to the interrogatories he was submitted to." (*Id.* at 5).

Defendant took Dr. Kouassi's deposition on February 3, 2015 at the United States District Courthouse in Peoria, Illinois before a certified shorthand reporter. Contrary to Dr. Kouassi's understanding, it is she, a third-party, and not Defendant or Defendant's counsel, who created the transcript. At the close of the deposition, as is his right, Dr. Kouassi requested the opportunity to review his deposition transcript and make necessary changes. *See* Fed. R. Civ. P. 30(e).

On February 16, 2015, the Court reporter sent to Dr. Kouassi a copy of the deposition transcript, along with a cover letter. (Doc. 67-1 at 285). The cover letter instructed Dr. Kouassi that he should read the transcript, "indicate any changes

and/or corrections desired on the errata sheets," "sign the signature page before a notary public," and return the errata sheets and signature page to Defendant's counsel. (*Id.*).

Thereafter, any changes that Dr. Kouassi wished to make to his deposition transcript needed to be made pursuant to Federal Rule of Civil Procedure 30(e). Under Rule 30(e), a deponent who seeks to change his deposition in form or substance must "sign a statement listing the changes and the reasons for making them" within 30 days of being notified by the court reporter that "the transcript or recording is available."

Dr. Kouassi first wrote to counsel for Defendant on March 4, 2015. (Doc. 79-5 at 1). In his letter, he acknowledged receipt of the transcript of his deposition. He stated generally that, "the answers attributed to me in this transcript do not reflect at all what I said during the deposition. Most of the answers I gave have been seriously distorted. The magnitude of the distortion is such that it is impossible for me to make all my corrections on the document sent to me." (*Id.*). However, he endeavored to "roughly make some initial comments on a copy [Defendant] sent" and thereafter requested that Defendant's counsel "make the appropriate revisions and corrections given that the deposition has been recorded." (*Id.*). He attached a copy of the first 204 pages of the transcript with his own handwritten comments made throughout it. The annotated transcript includes some light line-editing, but it also includes a number of instances in which Dr. Kouassi altogether denied responsibility for full answers and made no attempt to correct them. (*See, e.g.*, Doc. 79-5 at 34, 36, 71-72). These letters suggest that Dr. Kouassi expected Defendant to

create, from scratch, a new and more accurate transcript of his deposition. Because Defendant failed to do this, Dr. Kouassi moved to strike the deposition.

Dr. Kouassi's request fails for two primary reasons. First, the nature of the relief that Dr. Kouassi seeks is not consistent with Rule 30(e). When a deponent submits a statement listing changes to the deposition and reasons for the changes, he is not making a change to the actual transcript. Rather, the statement listing the changes is attached to the deposition. *See* Fed. R. Civ. P. 30(e)(2); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) ("[T]he rule requires that the original transcript be retained (this is implicit in the provision of the rule that any changes made by the deponent are to be appended to the transcript) so that the trier of fact can evaluate the honesty of the alteration."). Therefore, at a minimum, the Court would consider Plaintiff's deposition along with any properly-submitted errata sheet rather than striking the transcript altogether.

The Court, however, will not consider Dr. Kouassi's corrections because he did not offer them in a manner that complies with Rule 30(e). "The procedural requirements of Rule 30(e) are clear and mandatory." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 265 (3d Cir. 2010). In order to change deposition testimony in form or substance, deponents must satisfy a number of procedural hurdles. Among them, and one that trips Dr. Kouassi, is the requirement that deponents provide a statement of reasons for necessary changes. *See id.* at 266. General reasons will not suffice; courts require that deponents submit a reason for every change they would like made to a deposition transcript. *See Duff v. Lobdell-Emery Mfg. Co.*, 926 F. Supp. 799, 804 (N.D. Ind. 1996); *Holland v. Cedar Creek Min., Inc.*, 198 F.R.D. 651,

653 (S.D. W. Va. 2001) ("The witness is also plainly bound by the rule to state specific reasons for each change."). Here, rather than providing specific reasons for each requested change to the deposition, Plaintiff has made a blanket assertion that the deposition transcript does not accurately reflect the answers that he provided. In certain places of the transcript, where Plaintiff has identified minor transcription errors that do not change the substance of his answers, the Court has little doubt that his requested changes are well-taken. Yet, in these places, Plaintiff fails to state a reason even though the rule requires that he provide one. In other areas, Plaintiff makes no attempt to change the form or substance of his answers and instead wishes to strike them altogether. In these circumstances, he has provided some kind of reason – arguing that the answer is not his own – but has not suggested any sort of changes. This, too, is not compliant with Rule 30(e).

Because Plaintiff has not complied with the procedural requirements of Rule 30(e), the Court will not only deny Plaintiff's motion to strike the deposition testimony. It will also not consider the handwritten comments and edits that Plaintiff made on his transcript and submitted to Defendant.

## II. Unsupported Assertions Presented by Dr. Kouassi

Before outlining the relevant material facts, the Court believes it is prudent to make some general observations about the evidence that Plaintiff has presented in an effort to demonstrate why it is insufficient to serve the purpose that Plaintiff wishes it to serve. This review is hardly exhaustive, but is helpful as a starting point.

As the Seventh Circuit has said, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). A plaintiff "cannot thwart summary judgment by asking a court to make inferences based on flights of fancy, speculations as to the defendant's state of mind, hunches, intuitions or rumors about matters remote from that experience." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 508 (7th Cir. 2004).

At summary judgment, the Court must "review carefully statements of material facts and . . . eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement." *Butler v. East Lake Mgmt. Grp., Inc.*, No. 10-cv-6652, 2014 WL 273650, at *2 (N.D. Ill. Jan. 24, 2014). Unfortunately for Plaintiff, much of his submission is not based upon what summary judgment requires – citations to "particular parts of materials in the record" that can be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c). Rather, he has made many assertions that are based upon hearsay or are generally outside of his personal knowledge and not supported by other evidence.

One common way in which parties often submit facts for a court's consideration at summary judgment is through affidavits or declarations that are made on the basis of personal knowledge. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of the materials in the record, including . . .

affidavits or declarations"); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

Affidavits and declarations submitted by parties at summary judgment are defined by certain characteristics that allow a court to consider them. For example, an affidavit "is admissible in a summary judgment proceeding only if it is sworn to before an officer authorized to administer an oath, such as a notary public." *Trapaga v. Cent. States Joint Bd. Local 10*, No. 05 C 5742, 2007 WL 1017855, at *2 (N.D. Ill. Mar. 30, 2007). Declarations made pursuant to 28 U.S.C. § 1746 are "equivalent to an affidavit for purposes of summary judgment," but need not be sworn. *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011). Pursuant to § 1746, a declarant's unsworn statement can be accepted at summary judgment so long as the statement is supported by a statement "in substantially the following form": "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2). The Seventh Circuit has gone so far as to consider verified statements made in response to motions for summary judgment, even when the responses themselves are not separate documents referred to as "declarations." For example, in *Owens*, the Seventh Circuit concluded that a pro se prisoner who "verified his response in opposition to the defendants' motion for summary judgment," had done enough "to make his allegations admissible." *See* 635 F.3d at 954.

In his opposition to Defendant's motion for summary judgment, Dr. Kouassi has not submitted a document that he identifies as his own affidavit or declaration. He has only submitted his brief in opposition. If his brief in opposition included language sufficient to verify the truth of those factual assertions for which he has personal knowledge, the Court would be in a position in which it could consider these statements. *See id.* However, his brief in opposition is not notarized, as an affidavit must be (only the Certificate of Service, which asserts that he mailed a copy of his opposition to the Court is sworn to in front of notary public). *See Trapaga*, 2007 WL 1017855, at *2. And although he has signed his brief, (*See* Doc. 77 at 84), Dr. Kouassi has neither included language that is compliant with 28 U.S.C. § 1746 nor made any other attempt to verify the truth of the statements contained in the brief. *See Owens*, 535 F.3d at 954. For that reason, the unsupported statements of fact that Dr. Kouassi has made in his brief are insufficient to serve as evidence at the summary judgment stage.

Supposing, however, that Dr. Kouassi had properly verified his response, many of the unsupported statements that he has included in it are statements about which he could not have personal knowledge. Therefore, they must be disregarded on that ground. Witnesses like Dr. Kouassi "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015) (internal quotation marks omitted). Of course, personal knowledge includes a declarant's inferences because "most of our personal knowledge is inferential." *Id.* However, these inferences must be "grounded in observation or

other first-hand personal experience," and cannot be "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)).

It follows, then, that statements that are made without personal knowledge do not constitute competent evidence at summary judgment even if they are made in a declaration, affidavit, or otherwise verified statement. This includes, for example, hearsay statements. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). In *Haywood*, a plaintiff attempted to present evidence that a defamatory statement was made against her by presenting her own testimony "that another employee told her about information received from the employee's superiors in corporate security." *Id.* The Court concluded that this evidence was "inadmissible hearsay on multiple levels," and was therefore "not enough to preclude summary judgment." *Id.* Although the Court concluded that statements by the plaintiff's managers might have constituted non-hearsay admissions of the Defendant, it explained that plaintiff's own version of the statements, which were based "on another employee's version of the statements, which is based on the employees' superiors' version of the statements," was not admissible. *Id.*

Dr. Kouassi's submission is chalk full of statements of this kind. For example, he claims that the chair of his department, Dr. Rose McConnell and his Dean, Dr. Susan Martinelli-Fernandez, stated that he would not be permitted to apply for promotion to Associate Professor unless he sought help with improving his accent. Similarly to the plaintiff in *Haywood*, Dr. Kouassi has no personal knowledge that

either had made such a statement. Rather, he was told this by another professor, Dr. T.K. Vinod. Therefore, Dr. Kouassi's testimony that his evaluators would not permit him to apply for a promotion until he visited the language center, is based on his version of statements, which was based on Dr. Vinod's version of the Dean's statements and Dr. McConnell's statements. This is inadmissible hearsay, and cannot be considered at summary judgment. *See id.*

Similarly, Dr. Kouassi claims that Dr. McConnell had his name removed from a list of faculty members who were authorized to access a campus classroom. Again, Dr. Kouassi relies upon hearsay. He has no firsthand knowledge that Dr. McConnell had his name removed from the list; he was informed of this by the Chemistry Department's secretary. This is inadmissible hearsay for the same reason that Dr. Vinod's comments are inadmissible hearsay. *See id.*

Finally, Plaintiff also relies upon considerable amounts of hearsay in claiming that Dr. McConnell falsified a student's GPA in order to prevent her from serving as his teaching assistant. For example, he writes, "[a]fter the student explained that a wrong course was used to lower her GPA, the chair responded that she should wait until the fall 2012 to make the corrections. That is, the student selected by Plaintiff will not be the TA for Plaintiff's summer course." (Doc. 77 at 83). He asserts that that the student told him that she wrote a letter to the Office of the Dean and the Office of Equal Employment Opportunity, and it was only after she sent this letter that "the Associate Dean took action to re-instate her GPA." (*Id.*). Plaintiff relies upon statements made by his student and statements made by third-parties that his student relayed to him. Here, where this evidence is offered to

prove the truth of the matter asserted, it is not competent at summary judgment. *See Haywood*, 323 F.3d at 533.

Unfortunately for Dr. Kouassi, it does not seem like he has conducted the kind of discovery necessary to produce admissible evidence on these points. The record does not contain depositions of or declarations or affidavits from Dr. McConnell, Dr. Martinelli-Fernandez, Dr. Vinod, the Department's secretary, or his student. Dr. Kouassi seems to acknowledge as much with respect to the incident concerning his teaching assistant. He writes in his motion, "In this particular case, the student, the Associate Dean, and Plaintiff's supervisor can testify. The Defendant can show at trial in the presence of a Jury that the allegations against him are false if that is the case instead of requesting a summary judgment." (Doc. 77 at 83). What Dr. Kouassi seems to misunderstand is that summary judgment is the time at which he must show his hand. *See Schacht*, 175 F.3d at 504. He cannot rely upon the promise that certain people can testify – he needs to show the evidence. He has not done that.

Dr. Kouassi has also made a number of assertions throughout his filing regarding the supposedly true reasons that WIU employees undertook certain actions. For example, he recounts the happenings of an October 19, 2012 chemistry department meeting in which the Provost attended and discussed the issue of predatory and vanity journals (which, as will become clear below, is a matter of central importance to this case). (*See* Doc. 77 at 36-37). There, the Provost confirmed that articles published in such journals could not be used for promotion or tenure. Plaintiff alleges that he proposed that the University "select an external

committee of peer-reviewers to review articles published by all faculty members of the Department of Chemistry at large." (*Id.* at 37). He asserts that this proposal has considerable merit, in that it would be based upon the opinions of third-party experts. The Provost rejected his suggestion, an act which Plaintiff argues "was a clear indication that the provost's real intention was not to protect the integrity of the institution as he claimed, but to target plaintiff applying for tenure in less than three months." (*Id.*). Supposing that these facts were presented in a proper affidavit or declaration or in deposition testimony (they were not), the Court would still not be able to accept the inference that the Provost rejected Plaintiff's proposal out of animus rather than because he simply disagreed with it. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 461 (7th Cir. 2014) (explaining that speculation into a decision maker's state of mind, which "attempts to substitute [the Plaintiff's judgment] (and thus [the Court's]) for that of the employer," is insufficient to create a material dispute of fact that can defeat summary judgment).

Based upon these insufficiencies, as well as others that the Court will discuss later in the opinion, the Court has carefully screened the evidence presented by the parties. Unless otherwise indicated, the background facts discussed below reflect the Court's determination of the undisputed facts, and are drawn from the parties' statements of facts and responses thereto. (Docs. 67, 77, and 79).

## FACTUAL BACKGROUND

Dr. Kouassi is a chemist who was born and raised in Ivory Coast, in western Africa. He is of African descent, and is Black. After earning a Ph.D. in Food Chemistry from the University of Helsinki in Finland in 2003 and completing a

post-doctoral research fellowship at Pennsylvania State University that began in 2004, he started work in the fall of 2007 as an Assistant Professor of Chemistry for WIU. Dr. Kouassi's employment there ended in the spring of 2014, one year after Defendant declined to extend him an offer for tenure.

WIU hires non-tenured assistant professors like Dr. Kouassi on a probationary basis. Each year during their probationary status, WIU's professors are evaluated for the purpose of determining whether the University will retain them for the following academic year. The criteria and method that WIU uses to evaluate these employees is dictated by an agreement between it and the University Professors of Illinois Local 4100. (Western Illinois University and University Professionals of Illinois Local 4100 2010-2015 Agreement (hereafter "WIU/UPI Agreement"), included in the record at Doc. 68-1 at 37-88, Doc. 68-2 at 1-88, and Doc. 68-3 at 1-23). The agreement states that professors are evaluated on the basis of their teaching duties, scholarly activities, and service activities. (WIU/UPI Agreement, Art. 20.4(a)). Each academic department is responsible for developing and describing standards that will be used in evaluating employees' retention, tenure, and promotion. (*Id.* at Art. 20.4(b).).

The WIU/UPI Agreement also governs the manner in which probationary employees can apply for promotion from assistant professor to associate professor, and the timeframe in which probationary employees must apply for tenure. Because WIU hired Dr. Kouassi before September 1, 2007, he was permitted to – and did – apply for promotion to Associate Professor in his fifth year of full-time service at

WIU. (*See* WIU/UIP Agreement, Art. 20.9(b)(1)).[1] Professors apply for tenure during their sixth probationary year. A probationary employee is granted tenure by WIU's Board of Trustees, upon a positive recommendation of the WIU's president. (*Id.* at Art. 20.10(a)). Untenured professors who either fail to apply for tenure during their sixth probationary year or who are not granted tenure receive a terminal contract for the following academic year.

By agreement, the criteria for tenure (which, again, are established by the probationary employee's department) are identical to the criteria for promotion to Associate Professor. (*Id.* at Art. 20.4(h)). The WIU Chemistry Department requires that a faculty member who applies for promotion to Associate Professor or for tenure "have at least two peer-reviewed article [sic] describing scholarly work carried out at WIU (on which the faculty member is either the principal author or a major contributing author) published in national/international journal(s)." (Doc. 68 at 17). Although tenure is governed by the same standards as promotion to associate professor, the WIU/UIP agreement also provides that "[t]enure shall not be acquired automatically by length of service or prior promotion." (WIU/UIP Agreement at Art. 20.10(c)).

Candidates for retention, promotion, and tenure are evaluated independently by their Department Chair, Dean, and evaluation committees comprised of faculty. At the department level, candidates are evaluated by a panel known as the Department Personnel Committee (DPC). In the event that Department Chair,

---

[1] Assistant Professors hired after September 1, 2007 were not permitted to apply for promotion to Associate Professor until they also applied for tenure. WIU/UIP Agreement Art. 20.9(b)(1).

DPC, or Dean makes a negative recommendation, two other personnel committees exist: the College Personnel Committee (CPC), which consists of the chairs of all of the DPCs in a particular WIU college, and the University Personnel Committee (UPC), which consists of nine tenured Professors who are elected from the various WIU colleges and other departments at the university. (*See* WIU/UIP Agreement at Art. 20.5). The University President reviews portfolios submitted by probationary employees, along with the recommendations from the relevant department chair, dean, and various faculty committees, in making personnel decisions related to retention, promotion, and tenure.

Professors at WIU may also apply for what are known as Professional Achievement Awards, or PAA's. Professors qualify for PAAs by earning points based upon their performance, and successful applicants are awarded salary stipends. Publications submitted in support of a PAA are subject to the same academic standards as publications submitted in support of retention, promotion, or tenure.

**I. Kouassi's Evaluations**

Dr. Kouassi was evaluated seven times for either retention, promotion, or tenure during his time at WIU: during Probationary Years (PY) one through five, when he applied for promotion to associate professor during PY5, and when he applied for tenure.

**a. Retention Reviews**

During all of his retention reviews from PY1-PY5, Dr. Kouassi enjoyed positive recommendations for retention from the Chemistry Department's DPC and the Chemistry Department Chair, Dr. Rose McConnell. In both PY2 and PY3, Dr.

McConnell and the DPC favorably noted that Dr. Kouassi had published papers based upon research he conducted during his post-doctoral fellowship at Penn State. For example, the DPC noted that the strength of this published work suggested that Dr. Kouassi would develop a productive publication record. Even in complimenting these publications, both Dr. McConnell and the DPC noted that Dr. Kouassi would need to publish papers based upon scholarly work carried out at WIU in order to obtain tenure.

In PY5, just before Plaintiff applied for promotion to Associate Professor, Dr. Kouassi was again recommended for retention. Yet in a letter addressed to WIU's President, Provost, and the College Dean, Dr. Kouassi took issue with a number of ways in which Dr. McConnell had evaluated him. The letter primarily raised complaints with the way Dr. McConnell evaluated his teaching. He also took issue with comments that Dr. McConnell made with respect to his accent in her teaching evaluations. This includes notes from her review of a class that Dr. Kouassi's accent, "while still very strong was not one that greatly prevents understanding" because he "spoke slowly and loudly enouncing each word carefully to be understood." (Doc. 77-5 at 8).[2] The University's Office of Affirmative Action and Equal Opportunity opened an investigation after Dr. Kouassi sent the letter.

WIU's Provost, Dr. Kenneth Hawkinson, responded to Dr. Kouassi's letter on December 19, 2011. He explained in his response that he could not consider Dr.

_____

[2] In addition to attaching his letter complaining about the teaching evaluations, Dr. Kouassi also included copies of the teaching evaluations as Exhibit 30 to his response. (*See* Doc. 77-16 at 65-71). These teaching evaluations relate to Plaintiff's intro-level chemistry class, in which Dr. McConnell notes that Plaintiff accommodates students who may not understand him because of his accent by speaking slowly.

Kouassi's letter when evaluating Dr. Kouassi for retention in PY5 because Dr. Kouassi had received positive evaluations from the Department Chair, Dean, and DPC, and the WIU/UPI agreement did not provide Dr. Kouassi with the opportunity to submit additional materials in the event that he was evaluated positively.

### b. Application for Promotion to Associate Professor

Dr. Kouassi applied for promotion from Assistant Professor to Associate Professor in January 2012, during his fifth probationary year. Plaintiff states that Dr. McConnell discouraged him from applying for a promotion by telling him that he did not have the appropriate number of years of experience under his belt.[3] Yet, when Plaintiff informed Dr. McConnell that he was eligible to apply for promotion, she said, "okay," and that it was none of her business.

Dr. McConnell, Dr. Martinelli-Fernandez, and the DPC all recommended in January 2012 that Plaintiff be promoted to Associate Professor. By letter dated May 4, 2012, University President Jack Thomas informed Plaintiff that he would be promoted to Associate Professor effective at the beginning of the Fall 2012 semester. Dr. Kouassi received a PAA the same year that he was promoted.

Dr. Kouassi submitted seven articles in support of his application for promotion to Associate Professor. The first three articles – two of which were published in 2007 and one of which was published in 2008 – were based upon

---

[3] Plaintiff also makes reference to emails and letters that were apparently sent to him by Dr. McConnell and Dr. Martinelli-Fernandez prior to his application for promotion to associate professor in which both Dr. McConnell and Dr. Martinelli-Fernandez supposedly encouraged him to seek help with his accent at the school's language center. (*See* Doc. 77 at 69). However, Plaintiff has failed to attach any evidence of these emails to his response. Therefore, the Court cannot consider this evidence.

research that he conducted or began during his post-doctoral fellowship at Penn State. Dr. McConnell, in her review, cited to the Chemistry Department's criteria, which require that the articles reflect work carried out at WIU in deciding to not credit these articles.

She also rejected articles four and five, as she concluded that he was not a major contributing author to the articles. Dr. Kouassi reported that his contribution to those articles was between 30 and 35%. In her review, Dr. McConnell also noted that the articles were outside of Dr. Kouassi's specific area of expertise.

However, she accepted Dr. Kouassi's sixth and seventh articles, which she claimed "demonstrate Dr. Kouassi's scholarly creativity." The sixth article, titled, "Magnetic and gold coated magnetic nanoparticles as tools for biodetection," was published in *Current Nanoscience* in 2011. Dr. Kouassi was the sole author of that publication. The seventh article, titled "Nano/Micro-encapsulation of linoleic acid in biopolymer matrices: effects of the physical state, water, and quercetin on oxidative and thermal stability," was in press at the *Journal of Encapsulation and Absorption Sciences* at that time. Dr. Kouassi was the lead author of the piece, which had six other authors. The chair noted that the publications "demonstrate Dr. Kouassi's scholarly creativity," and recommended that he "continue to pursue his own uniquely creative research ideas." She noted that his work on bio-encapsulation and magnetic nanoparticles "show[s] great promise for significant funding in the future from the National Institutes of Health for projects in bio-detection and/or nutritional health." She also noted that the two publications could "serve as springboards for competitive . . . grant applications." (Doc. 77-8 at 57).

The DPC also reviewed Dr. Kouassi's file for promotion, and similarly only credited his sixth and seventh articles toward meeting the two-article minimum requirement. It rejected his first three articles for the same reason that Dr. McConnell did, but was less clear about the reasons that it rejected the fourth and fifth articles. The DPC noted that Dr. Kouassi's file included a supporting letter from Dr. Made Gowda with respect to those publications. At the time, Dr. Gowda was on the DPC. The report notes that the DPC discussed this letter at length and agreed that the publications did not meet the department's criteria.

### c. The Problem of Vanity Publications

Dr. Kouassi applied for tenure in January 2013. Between the time in which Dr. McConnell, Dr. Martinelli-Fernandez, and the DPC considered his application for promotion and his application for tenure in January 2013, WIU's administrators, deans, and department chairs became concerned with some academics' practice of publishing in what they termed "predatory" or "vanity" journals. The university and chemistry department defined predatory or vanity journals as those that publish articles with little or no peer review and often require authors to pay a publishing fee.[4]

Dr. McConnell, for example, saw an article published in the *Chronicle of Higher Education* on March 4, 2012 that covered the ways in which predatory journals operate. (Doc. 68 at 4, 58-62). The article discussed the practice of certain journals to "accept virtually any article to collect fees from the authors" without

---

[4] Editors of scientific journals submit articles to peer review when they send them to experts in the field who are able to evaluate the approach and methodology of the experimental work and validity of the articles' conclusions.

subjecting the submitted article to rigorous peer-review. (Doc. 68 at 4). Dr. McConnell attached to her affidavit in support of Defendant's motion for summary judgment additional articles published in August and September 2012 that discuss the prevalence and problems of vanity journals. (*See* Doc. 68 at 63-77).

In the fall of 2012, Provost Hawkinson held a meeting with the various department chairs at WIU to discuss the problems of predatory journals. Also that fall, various academic departments at the university began addressing the issue with their faculty. Dr. McConnell first raised the issue of predatory journals with chemistry faculty, including Dr. Kouassi, at the close of a faculty meeting held on September 4, 2012. She then informed her colleagues that articles published in predatory journals would not be considered refereed journal publications, and would therefore not count toward promotion or tenure, or be accepted for PAA points. Minutes from the department meeting reflect Dr. McConnell's conclusion that all manuscripts submitted by faculty would be cross referenced with a list of predatory, open-access publishers developed and maintained by Jeffrey Beall, an academic librarian who was featured in the article published in the *Chronical of Higher Education*.

After the September 4, 2012 meeting, Dr. McConnell sent to chemistry faculty a copy of the list maintained by Jeffrey Beall, writing, "This is the Beall list of predatory publishers we discussed in the last department meeting. Please be reminded that journals supported by these predatory publishers will not be counted

as properly refereed journals . . . ." (Doc. 68 at 80).[5] Shortly thereafter, she received

an email from a faculty member, Dr. Tarab Ahmad, who would later unsuccessfully

apply for promotion to Associate Professor and tenure at the same time that Dr.

Kouassi applied for tenure. In the email, Dr. Ahmad complained that she had been

blindsided by the list, and that she had published four papers between 2011 and

2012 in journals that were included on it. The Provost wrote to Dr. McConnell and

Dr. Martinelli-Fernandez after Dr. Ahmad complained about the list, telling them

that the determination regarding the quality of a publication is made by a faculty

member's evaluators and not by the faculty member. Moreover, he wrote, "if an

oversight occurred in a past evaluation of a probationary employee, that oversight

must be corrected in subsequent evaluations." He concluded, "[y]our faculty should

decide together whether a journal is legitimate or not, and if not, it should not be

accepted." (Doc. 68 at 78).

At the Chemistry Department's October 15, 2012 department meeting, the

topic of predatory journals was raised again. Provost Hawkinson attended the

meeting and provided the department with various updates, including one on the

---

[5] In his response to Defendant's motion, Plaintiff suggests that there was an intermediate step. Prior to focusing on Jeffrey Beall's list, Plaintiff writes that "the Chair of the Department of Chemistry initiated an illicit process aimed at dissociating the criteria for promotion to Associate Professor from those of tenure using a non-contractual document they called the Department of Chemistry Bylaws." He suggests this failed because of opposition from the Professor's union. (Doc. 77 at 12-13). Dr. Kouassi also discussed this during his deposition. (*See, e.g.,* Doc. 67-1 at 73-74). However, he presented no evidence other than his own say-so (which the Court cannot accept) in response to Defendant's motion for summary judgment that tends to show that Dr. McConnell made unsuccessful efforts to amend the chemistry department's bylaws.

issue of predatory journals. He informed the department that articles published in vanity or predatory journals could not be used to gain promotion or tenure.

Dr. McConnell ultimately developed a rubric for department use in evaluating publications for purposes of promotion, PAAs, and tenure. The rubric was approved by the Chemistry Department's DPC and also approved by the Department Executive Committee. The rubric assessed a variety of characteristics of a journal and publisher under consideration, including (a) the journal's physical location and contact information, (b) whether the journal is listed in reputable indexes of science journals, (c)whether the journal is associated with a professional organization or university press, (d) information regarding members of the editorial board (i.e., number of members, affiliations, expertise, whether faculty members are junior or senior status) and reviewers, (e) whether reviewers are provided with clear guidelines, (f) the journal's membership in ethical societies, the presence of conflict of interest checks, and retraction policies, (g) whether the journal charges fees that are not typical for the discipline, (h) the selectivity and prestige of the journal, as measured by impact statements and its rejection/acceptance rate, (i) statements regarding rapid review or publication time, (j) whether the same authors frequently publish in the journal, and (k) the overall quality of the articles – including proofreading and cite checking.

On October 19, 2012, Dr. Kouassi filed with the Illinois Department of Human Rights an EEOC complaint in which he alleged that WIU discriminated against him on the basis of his race, color, national origin, and retaliation because it rejected articles he submitted for his tenure files and denied him a PAA. At the time

that he filed his EEOC complaint, his articles had not been evaluated for a PAA and he had not yet submitted his tenure file.

### d. Professor Kouassi's Tenure Review

Dr. Kouassi submitted his tenure portfolio in January of 2013. Pursuant to WIU/UPI agreement, his file was reviewed and evaluated on the basis of his teaching, scholarly/professional activities, and service to the University community.

Dr. Kouassi submitted eleven manuscripts in support of his application for tenure, and discussed ten of them in the narrative that accompanied the application. Dr. McConnell, the DPC, Dean Martinelli-Fernandez, the CPC, and the UPC all evaluated his application. Of the five reviewers making recommendations, only the CPC recommended tenure for Dr. Kouassi. The remaining evaluators found that Dr. Kouassi met WIU's expectations for tenure as far as teaching and service are concerned, but had not developed a tenure-worthy portfolio of peer-reviewed publications. On the basis of these reviews, President Thomas notified Plaintiff on May 3, 2013 that he would not recommend him for tenure.

### 1. Dr. McConnell

Dr. McConnell concluded that Dr. Kouassi met tenure requirements with respect to teaching and service to the university. As she had in the past, Dr. McConnell brought up difficulties associated with Dr. Kouassi's accent. She explained that Dr. Kouassi performed excellently during her classroom evaluations. However, she noted Dr. Kouassi's students' in Chemistry 201 and 202 (introductory chemistry classes) regularly commented that it is difficult to understand him during his lectures.

Dr. McConnell concluded that Dr. Kouassi did not meet tenure requirements with respect to scholarly and professional activities. Although she observed that the criteria for tenure and the criteria for promotion to Associate Professor are identical, she also noted that the WIU/UPI contract requires a "separate and distinct" evaluation for tenure because "[t]enure shall not be acquired automatically by length of service or prior promotion." She therefore purported to evaluate Professor Kouassi for a second time, "based on the current knowledge and understanding of Dr. Kouassi's scholarship activities." (Doc. 77-8 at 102).

Dr. McConnell concluded that Dr. Kouassi's publications in the *Journal of Encapsulation and Absorption Sciences* and *Current Nanoscience* could not be credited toward promotion because they were published in journals that did not meet the peer-review standards established by the department. She had previously credited these publications when Dr. Kouassi applied for promotion. Dr. McConnell noted that the *Journal of Encapsulation and Absorption Sciences* is published by an entity that lacks a physical location, lacks an association with a publishing ethics organization, does not require authors to sign conflict of interest statements, promotes extremely weak publications, includes people on its editorial board without consent, has published plagiarized work, and is not included in well-known scholarly indexes. She then proceeded to criticize Dr. Kouassi's article, explaining that it suffered from poor research design, faulty interpretation of data, unsubstantiated conclusions, and inaccuracies in the figures and grammatical and spelling errors in the article.

Dr. McConnell also concluded that Dr. Kouassi's article in *Current Nanoscience* was unacceptable because *Current Nanoscience* is not properly peer reviewed. She criticized the journal's publisher, Bentham Science, because of various professional shortcomings, including the fact that it has no posted physical location, a weak or non-existent statements of ethics, poor indexing, no conflict of interest requirements, publishes poor quality articles, and has infringed copyrights. She also identified shortcomings in Dr. Kouassi's article upon review, including the fact that it is missing references for "important statements and figures," includes "several instances of copyright infringement," and has "many grammatical errors." (*Id.* at 108).

Again, Dr. McConnell rejected articles submitted by Dr. Kouassi that were based upon his research and work during his post-doctoral fellowship. She rejected all other articles as either articles published in vanity publications or articles on which Dr. Kouassi did not make a major contribution. She concluded that "Dr. Kouassi has made poor choices in selection of journals in which to submit his manuscripts," and for that reason, he did "not meet the requirements for tenure in the area of scholarly/professional activities." (*Id.* at 111).

Based on her review of Plaintiff's publications, Dr. McConnell also recommended to Dr. Martinelli-Fernandez that Plaintiff's application for a PAA be discounted as his articles had not been published in peer-reviewed journals. Dr. Martinelli-Fernandez forwarded her recommendations regarding Dr. Kouassi's application for a PAA to Provost Hawkinson, who made the decision to deny Dr. Kouassi's application for a PAA.

## 2. The DPC

The DPC also concluded that Kouassi did not meet the requirements for his evaluation of scholarly and professional activities. Dr. McConnell was not a member of the DPC. The DPC utilized the same rubric that Dr. McConnell did, explaining that it used it in light of recent criticisms of predatory academic journals and vanity publications.

The DPC reviewed eleven articles that Dr. Kouassi submitted as part of his tenure file. It rejected publications 8, 9, and 10 for the same reason that it had previously rejected them when he applied for promotion to associate professor: they were based upon research that he conducted while he was a post-graduate researcher at Penn State.

The DPC had previously credited Dr. Kouassi's articles published in the *Journal of Encapsulation and Absorption Sciences* and *Current Nanoscience* for promotion. This time it rejected them both, and concluded that they were published in journals that were not properly peer reviewed. The DPC concluded that the the *Journal of Encapsulation and Absorption Sciences*, which is published by Science Research Open Access, does not meet department standards. The DPC pointed to a completed rubric which listed what it viewed as shortcomings. These include the fact that the journal has no physical location or address, is not listed in a number of scholarly databases, has people on its advisory board who are listed without consent, includes no information about its reviewers, no retraction policy, and no conflict of interest statement, has unlisted rejection/acceptance rates and impact factors, and charges publication fees. It concluded that *Current Nanoscience* and its

publisher, Bentham Science also do not meet the department's publication requirements. In evaluating Dr. Kouassi's article in *Current Nanoscience*, the DPC erroneously indicated that Dr. Kouassi was a "co-author of collaborative research with no major contribution," when in fact Dr. Kouassi was the sole author of the article. The DPC rejected the eleventh article that Dr. Kouassi submitted because he "was a co-author of collaborative research with no major contribution." It noted that it had previously decided that Dr. Kouassi had not made a major contribution. The DPC rejected the remaining articles that Dr. Kouassi submitted because they were both published in vanity publications and because Kouassi did not make a major contribution to the articles.

### 3. The CPC

The UPC and Dean Martinelli-Fernandez also recommended against tenure. The only entity to recommend that Dr. Kouassi be granted tenure is was the CPC, which is comprised of the chairs of the various departments in the College. The CPC only reviews tenure files if the DPC or Department Chair has made a negative recommendation as to tenure. Because both the DPC and Dr. McConnell evaluated Dr. Kouassi positively in the area of teaching and service, the CPC only evaluated Dr. Kouassi with respect to his scholarly and professional activities. It noted that "[t]he main point of contention regarding Dr. Kouassi's scholarly and professional activities was the requirement from the Department of Chemistry's departmental criteria for tenure that 'the faculty member must have at least two peer-reviewed articles describing scholarly work carried out at WIU . . . .'" (Doc. 77-7 at 3). The CPC did not challenge the conclusion that the journals in which Dr. Kouassi

published were predatory journals, but criticized "the inconsistency of the personnel process on the part of the Department of Chemistry." (*Id*.). It explained that "[t]his issue of predatory journals didn't come up until late in the summer of 2012," and that the Department of Chemistry "didn't officially adopt a policy on predatory journals until early in the fall semester of 2012, less than four months from the deadline for Dr. Kouassi's tenure portfolio." Until that point, "Dr. Kouassi received no indication from the Chemistry DPC or Chair that there was something wrong with his papers," a fact that led the CPC to conclude that it was "unfair to change the rules 'this late in the game,'" when Dr. Kouassi would not have had time to submit two articles "in true peer reviewed publications." (*Id*. at 3-4).

The CPC explicitly did not "absolve Dr. Kouassi for his role in this situation," and suggested he should have been on notice that the journals in which he published were not rigorous because "he got reviews that were artificial and low on substance." But by a vote of four to three, it recommended he receive tenure. (*Id*. at 4).

### 4. President Thomas

In a letter dated May 3, 2013, President Thomas wrote to Dr. Kouassi and informed him that he had failed to meet the criteria established by his department in the area of scholarly and professional development and for that reason he would not be granted tenure. President Thomas wrote that he received and reviewed the "materials in support of [Dr. Kouassi's] request for tenure and promotion." He concurred with the judgment of DPC and Dr. McConnell and concluded that Dr. Kouassi met the tenure requirements in the area of teaching and service. He noted,

however, concerns raised by students with respect to Dr. Kouassi's classroom performance.

President Thomas wrote that he concurred "with the judgment of the DPC, Chair, Dean and UPC" in their assessment that "the venues [in which Dr. Kouassi] published are not of sufficient quality to merit a positive recommendation." (Doc. 77-5 at 21). On this basis, President Thomas wrote that the evaluation letter served as Dr. Kouassi's 12-month notice of non-retention. (*Id*. at 22).[6] The WIU Board of Trustees met on June 7, 2013 and adopted Resolution No. 13.6/7 which contained a negative recommendation Dr. Kouassi's request for tenure. (*Id*. at 23). By letter of August 2, 2013, the Board's legal counsel wrote to Dr. Kouassi and informed him that he would be offered a terminal contract for the 2013-14 academic year. (*Id*.).

### e. Post-Tenure Decision

Professor Kouassi appealed WIU's decision to deny him tenure, and filed a grievance with the University Professors of Illinois union. On September 16, 2013, a "Step Two" grievance hearing was held. Following the grievance hearing, in a letter dated October 9, 2013, President Thomas offered Dr. Kouassi the opportunity to resubmit his tenure application in April of 2014. Dr. Kouassi declined this offer.

## II. Similarly Situated Employees & Circumstances

Dr. Kouassi points to a number of other incidents involving other faculty from the Chemistry department in an effort to show that he was singled out and treated in a discriminatory manner. These include the following:

---

[6] President Thomas's letter noted that Dr. Kouassi's contract would terminate at the end of the 2012-2013 academic year. This is inconsistent with the sentence that immediately preceded it, which stated that the evaluation letter (sent at the end of the 2013 academic year) served as his 12-month notice of non-retention.

- Dr. Kouassi asserts that Dr. McConnell, who is white, along with two colleagues who are not Black and served on the DPC when Dr. Kouassi's tenure application was under consideration, published a paper in the journal *Intech*, which he asserts is on the Beall list of predatory journals.

- Dr. Kouassi asserts that WIU subjected him to a different standard than it subjected Dr. Scott McConnell, who is a white American, when he applied for promotion to the position of full professor. Dr. Kouassi suggests that the department credited one of Dr. Scott McConnell's articles, which was researched and drafted when he was employed by another university, yet failed to credit his articles from Penn State.

- Dr. Kouassi asserts that WIU subjected him to a different standard than it subjected Dr. T.K. Vinod, who is Indian, when he applied for tenure. Dr. Kouassi argues that Dr. Vinod only had one publication at the time he applied for tenure, that he was not a primary author of the article, and that most of the work and research occurred at a university in India. Yet, Dr. Kouassi complains that WIU did not provide him with credit for articles on which he was not the primary author.

The University, on the other hand, has presented evidence that Dr. Kouassi was treated similarly to Dr. Tarab Ahmad, who it asserts is white and does not share Dr. Kouassi's national origin. Dr. Ahmad applied for both tenure and a promotion in 2012, when Dr. Kouassi applied for tenure. Like Dr. Kouassi, various evaluators recommended that she did not meet WIU's tenure requirements because

she failed to publish in properly refereed journals. Also like Dr. Kouassi, President Thomas did not recommend her for tenure and she did not receive tenure.

## III.    Other Indignities

In addition to decisions made regarding promotion and tenure, Dr. Kouassi has alleged that Defendant's agents subjected him to other complaint-worthy treatment. In start of the Fall 2012 semester, before Dr. Kouassi applied for tenure, and before the Department's discussions regarding predatory or vanity journals, Dr. Kouassi found himself locked out of a classroom in which he taught an introductory chemistry class. Dr. Kouassi testified during his deposition that he informed Dr. McConnell that he could not enter the classroom, and for two weeks he needed the assistance of the Chemistry Department's secretary to enter the room. On September 7, 2012, Dr. Kouassi emailed Dr. McConnell and Dr. Mark Boley, who served as the faculty's building representative, requesting assistance. Dr. Kouassi was issued a new key on that day.

Dr. Kouassi also asserts that Dr. McConnell attempted to keep a student from serving as his TA by falsifying her GPA. Dr. Kouassi admits that the student did end up serving as his TA.[7]

_____

[7] In Defendant's motion for summary judgment, WIU also noted that Dr. Kouassi claimed in his deposition that WIU discriminated against him by sanctioning him in 2013 and by hiding certain teaching evaluations. Defendant in its motion suggested that Dr. Kouassi lacked evidence to show that he was sanctioned because of his race or in retaliation for his EEOC complaint and it also suggested that Dr. Kouassi has no evidence that Dr. McConnell hid his teaching evaluations. In his response, Dr. Kouassi made no attempt to address these contentions. They are therefore waived.

Dr. Kouassi has brought claims pursuant to Title VII for discrimination on the basis of race and national origin, as well as for retaliation. He has also brought a claim pursuant to 42 U.S.C. § 1981 for race discrimination. The Court will address Dr. Kouassi's Title VII claims before moving on to his § 1981 claim.

### I.   Dr. Kouassi's Title VII Claims for Retaliation and Discrimination on the Basis of Race and National Origin

Among other categories, Title VII prohibits discrimination in employment on the basis of race and national origin. *See* 42 U.S.C. § 200e-2(a); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 809 (7th Cir. 2011). Additionally, it prohibits employers from retaliating against those employees who oppose discriminatory conduct. *See* 42 U.SC. § 2000e-3(a). The purpose of Title VII's anti-retaliation provision is to "prevent employer interference with unfettered access to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 63, 68 (2006) (internal quotations marks omitted).

Dr. Kouassi has brought claims against WIU under both discrimination and retaliation theories. As the Seventh Circuit has acknowledged, "[t]he decisionmaking process in an academic hierarchy creates further complication" when evaluating Title VII cases that emerge after a university has denied a professor tenure. *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 817 (7th Cir. 2012). Here, where the tenure decision was made by WIU's President after he received recommendations from various other committees and individuals, Plaintiff can

prevail only by showing either that the President was motivated by a discriminatory or retaliatory purpose or by showing that his decision was "decisively influenced by someone who *was* prejudiced." *Id.*

Dr. Kouassi can attempt to prove this in two ways: through the direct or indirect methods of proof. *See Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007); *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). Under the direct method of proof for retaliation, a plaintiff must show that he (1) engaged in a statutorily protected activity, (2) he suffered an adverse action taken by the employer, and (3) the two are causally connected. *Lewis*, 496 F.3d at 655. Under the direct method in a discrimination case, "a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motivation," when it took an adverse action. *Collins v. American Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013). Direct evidence is evidence that, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). In the absence of direct evidence, a plaintiff can survive summary judgment by "construct[ing] a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) (internal quotation marks omitted).

Meanwhile, "[t]he indirect method applies the familiar *McDonnell Douglas* framework to create a presumption of discrimination or retaliation in the absence of any direct or circumstantial evidence." *Volovsek v. Wisconsin Dept. of Ag., Trade*

*and Consumer Prot.*, 344 F.3d 680, 692 (7th Cir. 2003). To succeed under the indirect method, a plaintiff "must establish that 1) []he is a member of a protected class (or performed the protected act of filing a complaint), 2) []he . . . has met the defendant's legitimate work expectations, 3) the defendant took [an] adverse employment action against [him], and 4) the defendant[] treated similarly situated employees outside of the protected class (or who did not complain) more favorably." *Id.* Once a plaintiff has made this *prima facie* case under the indirect method, the defendant has the burden of providing a nondiscriminatory reason for the employment action. *Id.* Should the defendant successfully provide a nondiscriminatory reason, the plaintiff has the burden of showing that that reason is pretext for discrimination. *Id.*

WIU asserts that Dr. Kouassi has failed to provide sufficient evidence of retaliation and discrimination under the direct method of proof and has also failed to make a *prima facie* case of retaliation or discrimination under the indirect method. Dr. Kouassi, meanwhile, asserts that he has evidence that can satisfy either the indirect or direct method of proof for both retaliation and discrimination.

### a. Adverse Action

Before considering each claim for retaliation or discrimination independently under each test, the Court must consider whether Dr. Kouassi has suffered an adverse action – an element that is common to all claims and all tests. Plaintiff has claimed or seems to claim that a number of WIU's actions constitute adverse actions. These include: denying him tenure, denying him a PAA, criticizing his accent and encouraging him to attend the language center, informing him that he

was ineligible to apply for a promotion to associate professor, discounting his articles when he applied for a promotion to associate professor and applied for a PAA in 2011, allegedly locking him out of a classroom in which he taught a large undergraduate section, and allegedly falsifying the GPA of his TA. Additionally, Plaintiff alleges that Defendant took an adverse action against him when the University President wrote him the May 3, 2013 letter informing him that he would not be recommended for tenure because the letter contained two false statements: first, it claimed that Plaintiff had applied for both tenure and promotion, when in fact he had only applied for tenure; second, it claimed that Plaintiff's employment would end at the close of the 2013 academic year rather than at the end of the 2014 school year.

### 1. Discrimination Claims

"Title VII generally covers two types of employment discrimination: so-called discrete acts of discrimination . . . and acts that create a hostile workplace." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). For the purpose of Plaintiff's discrimination claims, a discrete act of discrimination is an adverse action when it results in "a quantitative or qualitative change in the terms or conditions of employment." *Haywood*, 323 F.3d at 532. Acts that create a hostile workplace are those acts that are both subjectively and objectively offensive, severe or pervasive, and based on membership in a protected group. *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014).

Only Dr. Kouassi's denial of tenure and denial of a PAA changed terms or conditions of his employment in a material way. *See Haywood*, 323 F.3d at 532.

Defendant argues that it did not take an adverse action when it denied Dr. Kouassi tenure because Dr. Thomas offered Dr. Kouassi an additional probationary year, after which he could resubmit his tenure portfolio. Defendant suggests that because Dr. Kouassi did not accept this offer, he voluntarily terminated his employment with it. This argument is misplaced. Dr. Thomas offered Plaintiff an additional probationary year at the conclusion of Plaintiff's official grievance through his union. As a recent district court reasoned, precedent suggests that the initial denial of tenure constitutes an adverse employment action for the purpose of Title VII, even if a university subsequently reconsiders its decision. *See Barron v. Univ. of Notre Dame Du Lac*, No. 11-cv-440, 2015 WL 1186272, at *5 (N.D. Ind. Mar. 13, 2015). This is true in part because the limitations period for filing with the EEOC begins ticking at the initial denial of tenure rather than at the point when an unsuccessful tenure candidate loses an appeal. *See id.* (citing *Delaware St. Coll. v. Ricks*, 449 U.S. 250, 259 (1980); *Williamson v. Ind. Univ.*, 345 F.3d 459, 463 (7th Cir. 2003)); s*ee also Tsitsopoulou v. Univ. of Notre Dame,* 10-cv-309, 2011 WL 839669, at *3-4 (N.D. Ind. Mar. 7, 200) (holding that grievance process does not toll statute of limitations for filing with EEOC after initial denial of tenure).

Defendant's denial of a PAA also constitutes an adverse employment action. Faculty at WIU apply for PAAs based on a set point-based rubric. If faculty members have accumulated the proper number of points, they are awarded a PAA, which comes with a stipend that supplements their annual salary. In this regard, a PAA functions as a raise, rather than a bonus. *See Hunt v. City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000)(explaining that a bonus is "sporadic, irregular,

unpredictable, and wholly discretionary on the part of the employer," while a raise is "the norm for workers who perform satisfactorily"). Denying a raise is an adverse employment action. *See id.*

The other things about which Dr. Kouassi complains are not adverse employment actions that can support a discrimination claim. Although these actions may have caused him considerable unhappiness, they did not change the terms or conditions of his employment. *See de la Rama v. Illinois Dep't of Human Srvs.*, 541 F.3d 681, 686 (7th Cir. 2008). Dr. Kouassi argues that Dr. McConnell took an adverse action against him when she failed to credit certain articles toward his promotion and his earlier PAA, and also when she criticized certain aspects of his teaching in her PY5 evaluation. He also argues that Dr. McConnell took an adverse action against him when she told him that he was ineligible to apply for a promotion. Yet it is undisputed that Dr. Kouassi received a promotion and received that PAA. He claims that Defendant took an adverse action against him by locking him out of his classroom and by purposely deflating the GPA of a student he selected to be his TA, but he has not produced competent evidence that either of these things occurred. Moreover, it is undisputed that he continued to teach and that the graduate student in fact served as his TA. Finally, Dr. Kouassi has argued that Dr. Thomas took an adverse action by informing him that his contract with the University expired at the end of the 2012-13 school year rather than at the end of the 2013-14 school year. Yet it is undisputed that Plaintiff's contract with WIU ended at the end of the 2013-14 academic year, notwithstanding any statement to the contrary in Dr. Thomas's letter. Moreover, it is clear from the context of Dr.

Thomas's letter that his statement was a typo, as he also informed Plaintiff that the letter served as his twelve-month notice of non-retention and the letter was delivered at the end of the 2012-13 academic year.

It is possible that Plaintiff intends to prove his case on a theory that he was subjected to a hostile work environment. Throughout his brief, he refers to the humiliation he suffered when Dr. McConnell and Dr. Martinelli-Fernandez remarked on his accent. (*See, e.g.*, Doc. 77 at 4, 8, 28). However, Dr. Kouassi has not presented evidence that he was subject to harassment, let alone harassment that was "severe or pervasive." *See Nichols*, 755 F.3d at 600; *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921, 927, 936-37 (N.D. Ill. 2014) (holding that an employer's comments regarding employee's accent, such as remarking that vendors might have a difficult time understanding her and that she needed to practice language skills because her "European accent" was "getting in the way," do not "approach what reasonably might be considered severe or pervasive behavior.").

## 2. Retaliation Claims

Things that do not qualify as adverse actions in a discrimination case might qualify as adverse actions in a retaliation case. In a retaliation case, an adverse action is "one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 740 (7th Cir. 2011) (quoting *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)). Courts take a context specific approach, and consider whether an objective person would be dissuaded from exercising his Title VII rights based on the allegedly retaliatory

behavior. *See Trimble v. Alliance-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 774 (N.D. Ill. 2011).

Again, most of the actions that Plaintiff has suggested were taken with a retaliatory intent do not amount to adverse employment actions under Title VII. Dr. Kouassi alleges that Dr. McConnell and the DPC retaliated against him by rejecting a number of his articles when he applied for promotion to associate professor. In certain contexts, "a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation." *Silverman*, 637 F.3d at 741; *Trimble*, 801 F. Supp. 2d at 777. In both *Silverman* and *Trimble*, employees received negative reviews that had the potential of causing later employment consequences; the courts concluded that this fact could chill a reasonable employee's exercise of his Title VII rights. In the present case, however, the Chemistry Department evaluated Dr. Kouassi's articles as part of its consideration of his application for promotion, and then went on to recommend him for promotion. The fact that the department rejected certain of his articles cannot constitute an adverse action because it did not carry the threat that Dr. Kouassi would not receive the promotion. *See Trimble*, 801 F. Supp. 2d at 777. Indeed, the recommendations for promotion were entirely unaffected by the failure to credit these articles.

Most other complaints that Dr. Kouassi has raised are "akin to the sort of trivial harms that do not rise to the level of retaliation." *See Recio v. Creighton University*, 521 F.3d 934, 940 (8th Cir. 2008); *see also Burlington Northern*, 548 U.S. at 69. Dr. Kouassi alleges that Dr. McConnell discouraged him from seeking

promotion, yet he applied for and received a promotion. He alleges that President Thomas took steps to terminate his employment at the close of the 2012-13 school year, but it is undisputed that he worked through the 2013-14 school year. He has not presented competent evidence that Defendant purposely changed classroom locks or that Dr. McConnell prevented him from selecting his TA.

Therefore, as with Dr. Kouassi's discrimination claims, then, the only adverse actions that Dr. Kouassi suffered were the denial of his PAA and the denial of tenure, each of which came about because of the way in which various relevant people evaluated his published articles.

### b. Direct Method of Proving Retaliation

Under the direct method of proof for retaliation, a plaintiff must show a causal connection between his statutorily protected activity and any adverse action taken by his employer. *Lewis*, 496 F.3d at 655. Dr. Kouassi argues that he can show retaliation by creating a convincing mosaic of circumstantial evidence. A number of sources are available to plaintiffs who seek to construct such a mosaic, including "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn," "evidence but not necessarily rigorous statistical evidence that similarly situated employees were treated differently," and "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (citations omitted). Dr. Kouassi attempts to demonstrate a causal connection by providing evidence of suspicious timing, ambiguous statements,

pretext, and the experiences of similarly situated employees. None of the evidence that Plaintiff provides is sufficient.

"Close temporal proximity provides evidence of causation, and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link." *Lang v. Illinois Dep't of Children and Family Services*, 361 F.3d 416, 419 (7th Cir. 2004) (citation omitted). "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Lalvani v. Cook Cnty*, 269 F.3d 785, 790 (7th Cir. 2001). Dr. Kouassi engaged in two relevant protected activities. First, he wrote a letter to the president and the dean complaining about the treatment he received from Dr. McConnell. Later, he filed an EEOC complaint alleging that the university had discriminated against him on the basis of race and national origin in denying him tenure. Suspicious timing cannot support an inference of retaliation in either case.

Plaintiff first complained of discrimination just before he applied for a promotion. Shortly thereafter, Defendant promoted him to associate professor and awarded him a PAA. During the next academic year – and after other opportunities for Defendant to retaliate against him had come and gone – the Chemistry Department began discussing new ways in which it would begin to review articles presented for promotion or tenure. This lengthy period of time between Plaintiff's first protected action and the initiation of the process that culminated in

Defendant's adverse actions does not create a genuine issue of fact that supports an inference of retaliation. *See Anderson v. Donahoe*, 699 F.3d 989, 996 (7th Cir. 2012).

The University's decision to not award Dr. Kouassi a PAA or offer him tenure followed more closely on the heels of Dr. Kouassi's second protected activity: filing an EEOC complaint in October of 2012. However, the undisputed evidence shows that nothing about this timing was suspicious. Dr. Kouassi filed his EEOC complaint before Defendant denied him tenure or rejected his PAA application and complained that Defendant had discriminated against him by denying him tenure and rejecting his PAA application. Defendant subsequently denied him tenure and rejected his PAA application. Defendant did not change its posture or behavior in the aftermath of Plaintiff's protected activity; rather, after Dr. Kouassi filed his EEOC complaint, Defendant acted in a manner that was consistent with how its employees said it would act. Plaintiff cannot create an inference of retaliation by filing a well-timed EEOC complaint and waiting for the other shoe to drop.

Next, Plaintiff argues that President Thomas made two ambiguous statements in his May 3, 2013 letter informing him that he would not be tenured. First, the letter referred to "[t]he materials in support of [Plaintiff's] request for tenure and promotion," and second, the letter informed Plaintiff that the letter "serves as [his] 12-month notice of non-retention," and referred to Plaintiff's terminal contract year as the 2012-2013 academic year. Plaintiff suggests that Dr. Thomas's letter purposely attempted to depict him as a "non-Associate Professor," a tack that would supposedly have made it easier for President Thomas to deny him tenure. Moreover, he points out that had his contract terminated at the end of the

2012-2013 academic year (it did not), Defendant would have violated the WIU/UPI contract that provided all professors denied tenure with a final year to teach.

Although these two statements in Dr. Thomas's letter may be incorrect, they are not ambiguous statements of the kind that are useful to show causal connection in retaliation cases. Ambiguous statements "must point directly to a discriminatory reason for the employer's action." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014) (quoting *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 777 (7th Cir. 2013)). Of course, "ambiguous statements are . . . by their nature vague." *Kasten v. Saint Gobain Performance Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012). That just means, however, that they are susceptible to multiple possible readings, some that are innocuous and others that may be indicative of retaliation. For example, when a supervisor tells an employee to "just lay down and tell them what they want to hear, [they] can probably save your job," before the employee enters a suspension hearing, it could be either "benign encouragement" or a warning that the employee faced consequences if he continued to engage in protected activity. *See id.* Here, the ambiguous statements that Dr. Kouassi points to lack any indicia whatsoever of retaliation.

Next, Dr. Kouassi argues that Defendant's reason for denying him tenure and a PAA is pretextual. Defendant has provided a legitimate, nondiscriminatory reason for denying Dr. Kouassi tenure and failing to award him a PAA: it asserts that his publication record does not satisfy the Department of Chemistry's standards for tenure, which require that he publish at least two articles reflecting work carried out at WIU in a properly peer-reviewed journal.

45

"Pretext can be shown by "identif[ying]. . . weaknesses, implausibilities, inconsistencies, or contradictions" in an employer's provided rationale for taking an adverse employment action such "that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d at 852-53. In evaluating Defendant's purported non-discriminatory reason for taking an adverse action against Dr. Kouassi, "[t]he question is not whether the . . . reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Id.* (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). If WIU declined to grant Dr. Kouassi tenure because it "honestly believed" he failed to meet the Chemistry Department's standards, Dr. Kouassi loses. *See Coleman*, 667 F.3d at 853; *see also Vanasco v. National-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998) ("[A professor] must present evidence to suggest not that the University was mistaken in denying her tenure but that it was lying in order to cover up the true reason . . .").

Dr. Kouassi provides a number of reasons that he believes Defendant's reason for failing to grant him tenure and for declining to award him a PAA are pretext for retaliation. First, he argues that he is an accomplished scientist. Second, he argues that Defendant applied a different standard when it evaluated him for a promotion than when it evaluated him for tenure. And third, he argues that Dr. McConnell – who was responsible for the rubric evaluating predatory and vanity publications – has herself published in a publication that would meet the definition of a predatory or vanity publisher.

Dr. Kouassi's argument with the most facial appeal is the fact that Defendant previously promoted him to associate professor on the strength of two articles that the DPC and Dr. McConnell both praised, and just a year later determined that those same two articles failed to meet the standard for earning tenure (which is the same as the standard for promotion). He argues that this amounts to a failure on behalf of the University to follow its own policies and procedures, which is one way in which a plaintiff can demonstrate pretext. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 727 (7th Cir. 2005). However, Defendant has provided a fully consistent, non-discriminatory reason for evaluating Dr. Kouassi's publications with a more critical eye, and Dr. Kouassi has not presented evidence that calls the honesty of this explanation into question.

Defendant has presented unrebutted evidence that the university became increasingly aware of the problem of predatory and vanity journals after it had evaluated Dr. Kouassi for promotion to associate professor. It has, moreover, presented evidence that multiple departments in the University – and not just the Chemistry Department – responded to the problem of predatory and vanity journals. Finally, it has presented evidence that the Chemistry Department applied a consistent, heightened review to all articles presented by applicants seeking tenure, not just Dr. Kouassi. This heightened review of faculty publications is not inconsistent with the Department's requirement that faculty publish two articles in properly refereed journals, and Dr. Kouassi was held to this standard when he was evaluated for promotion to associate professor and evaluated for tenure. Moreover, it is not inconsistent with the WIU/UPI agreement, which states that professors

applying for tenure or applying for promotion must be independently evaluated each time they submit an application.

Dr. Kouassi's response to this is to attack the validity of the Chemistry Department's methods for evaluating publications. For example, he suggests that the Chemistry Department should have relied upon the opinion of outside reviewers; that the Chemistry Department impermissibly relied upon the opinions of non-scientists who were not qualified to identify vanity or predatory publications; and finally he suggests that other Chemistry Department faculty published in journals that could be considered predatory or vanity publications.[8] He relies upon these arguments in an effort to show that the Chemistry Department's evaluations were unreliable. He also challenges the rubric that Dr. McConnell and the DPC created to evaluate publications, suggesting that many of the criteria on the rubric are poor indicators that a journal or publisher is a vanity publication.

In making these arguments, Dr. Kouassi has not challenged the University's basic premise: that it instituted heightened review because of its emerging awareness of the problem of predatory journals. Rather, his arguments, at best, amount to an argument that the Chemistry Department's chosen method of

---

[8] For example, Dr. Kouassi argues that Dr. McConnell is a co-author of a piece that was published in *Intech*, a publication that has been identified as predatory. He suggests that this proves that the whole concept of vanity or predatory journals is false. First, Dr. McConnell has submitted an affidavit in which she asserts that she was not involved in the publication of the article and was not consulted about being named as an author prior to its submission. Moreover, the article does not tend to show that Defendant's reasons are pretextual. Plaintiff has not provided any evidence that this article was submitted in support of any particular faculty member's application for tenure, and there is similarly no evidence on the record that Dr. McConnell or the DPC reviewed any articles published by *Intech* using the newly-developed rubric. Therefore, Dr. Kouassi's argument that this publication can somehow demonstrate the shortcomings of the rubric is misplaced.

evaluating its faculty's publications has produced results that are inaccurate or wrong. These sorts of arguments are insufficient to demonstrate pretext. *See Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) ("[A]rguing 'about the accuracy of the employer's assessment' is a 'distraction' in the pretext context; the fact that a statement is inaccurate does not mean that it is a deliberate lie").

Plaintiff has also attempted to show pretext by arguing that Defendant's characterization of his work is untrue. For example, he details what he believes are his considerable accomplishments as a scientist. These include his invitations to give presentations at national conferences, the fact that he has been invited to contribute chapters and journal articles, his history as a reviewer for various journals, and his history as a successful teacher and collaborator with Western Illinois University students. However, the University's reasons for denying Dr. Kouassi tenure do not stem from its belief that he has provided inadequate service to the university, performed poorly as a teacher, or failed to engage with the greater scientific community. Rather, WIU denied him tenure for a wholly separate reason: he failed to produce publications during his time there that met its scholarly standards for tenure. Therefore, these reasons are insufficient to show pretext. *See Vanasco*, 137 F.3d at 968. Moreover, even if these characteristics were somehow relevant, "[a]n employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities." *Olsen v. Marshall & Illsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). Plaintiffs must produce other evidence to prove pretext.

Finally, Dr. Kouassi has suggested that all of his articles are, in fact, properly peer reviewed. In support of this contention, he has provided three pieces of evidence: the first is a document that he purports to be refereed comments of one of his articles from reviewers, the second is a copy of one of his articles that includes annotations that purportedly incorporate the comments of his reviewers, and the third is a copy of a manuscript that was apparently annotated by his colleagues at WIU prior to submission to a journal. None of these documents provides evidence that Dr. Kouassi's articles were subjected to the type of peer review that the University deems adequate.

"Evidence that an employer came to the wrong conclusion might suggest discrimination if the conclusion were incredible on its face or if it were accompanied by other circumstantial evidence." *Collins*, 715 F.3d at 1001. The evidence submitted by Dr. Kouassi hardly suggests that Defendant was incorrect in its assessment of his articles, let alone that its assessment was incredible. Indeed, the evidence on the record shows unanimous agreement among WIU reviewers that Dr. Kouassi published in vanity or predatory publications. Even members of the CPC, which recommended that he receive tenure, did not challenge the conclusion that Dr. Kouassi published in journals that failed to adequately peer review submissions. Meanwhile, the evidence produced by Dr. Kouassi suggest that, at most, external reviewers subjected his submissions to a cursory proofreading. In cases like this, courts must give some degree of deference to tenure decisions made by universities. *See Blasdel*, 687 F.3d at 816. Even in the absence of such deference,

Dr. Kouassi has not presented evidence that suggests the University's assessment was incorrect, let alone incredible.

The last way in which Dr. Kouassi attempts to construct a mosaic of circumstantial evidence of retaliation is by presenting evidence that he was treated differently than similarly situated colleagues. He has pointed to two possible comparators: Dr. Scott McConnell and Dr. T.K. Vinod. Plaintiff argues that Dr. Vinod was granted tenure after submitting an article for which he was a secondary author and that was based on research that had been conducted in India. Dr. Kouassi suggests that had the Department of Chemistry and the DPC accepted his articles that he published based on his research conducted at Penn State, he would have been granted tenure, as it is undisputed that they were properly peer-reviewed. He also argues that Dr. Scott McConnell, who joined Western Illinois University as a tenured associate professor from the University of Arkansas, where he was previously tenured, was promoted to full professor after he submitted an article that was based upon research that he conducted while he was employed by his prior university. Furthermore, Dr. Kouassi argues that Dr. Scott McConnell received full-credit for a publication for which he could not have been a major contributor.

Dr. Kouassi's attempt to present Dr. Vinod and Dr. Scott McConnell as comparators is marked by both evidentiary and analytical shortcomings. The Court will begin with the analytical issues. Dr. Kouassi must demonstrate that Dr. Scott McConnell and Dr. Vinod are "directly comparable to [him] in all material respects." *Abuelyaman*, 667 F.3d at 810. Typically, reviewing courts consider whether

potential comparators had the same job description, were subject to the same standards, were reviewed by the same supervisors, and had comparable experience, education, and other qualifications. *Id.*

There are critical differences between Dr. Kouassi and Dr. Vinod and Dr. Scott McConnell that make them inappropriate comparators. First, Dr. Kouassi and Dr. Vinod were evaluated at different times, by different evaluators, and under different standards. During his deposition, Dr. Kouassi acknowledged that the standards that the department used to evaluate Dr. Vinod for tenure were different from the standards that the department used to evaluate him. Dr. Vinod was evaluated for tenure under the Department of Chemistry's Departmental Criteria for Retention, Tenure, Promotion, and PAA that were in effect from September 1997 until September 2002. (*See* Doc. 67-1 at 900-100; Doc. 79-2, at ¶ 3). At the time of Dr. Vinod's promotion, the Chemistry Department evaluated publications submitted in support of tenure more leniently. It simply said, "publication of refereed work is required for tenure and for promotion at all ranks. . . ." (Doc. 79-3 at 4). However, at the time that Dr. Kouassi applied, the department required "at least two-peer reviewed article [sic] describing scholarly work carried out at WIU (on which the faculty member is either the principal author or a major contributing author) published in national/international journal(s)." (Doc. 68 at 17). These standards are materially different. The 1997-2002 department requirements do not, on their face, require more than one publication, and they also do not require that the articles describe scholarly work carried out at WIU. These significant differences make Dr. Vinod an improper comparator to Dr. Kouassi. *See Lim v. Trustees of Indiana Univ.,*

297 F.3d 575, 581 (7th Cir. 2002) (holding that faculty members who were granted tenure prior to a new department chair who implemented more stringent standards are not similarly situated to a faculty member who was denied tenure under the new department chair and new standards).

Dr. Scott McConnell suffers from similar problems as a potential comparator, the primary of which is that the University hired him as a tenured professor. Therefore, Dr. Kouassi is attempting to compare his failed application for tenure to Dr. Scott McConnell's successful application for a promotion to full professor. An associate professor applying for promotion to full professor must have "multiple peer-reviewed articles published in national or international journal(s)" while "in Associate Professor rank." (Doc. 68 at 16). Therefore, Dr. Scott McConnell, too, was evaluated under different criteria. Moreover, he was being evaluated for a promotion rather than for tenure. These two material differences keep Dr. Scott McConnell and Dr. Kouassi from being similarly situated. *See Lim*, 297 F.3d at 581; *Abuelyaman*, 667 F.3d at 810 ("tenured professors are simply not subject to the same stringent standards as nontenutred professors and therefore cannot serve as comparators.").

Even if Dr. Vinod and Dr. McConnell were appropriate comparators, Dr. Kouassi has not provided admissible evidence that shows he was treated differently than they were. The only evidence that Dr. Kouassi has provided in an effort to show that Dr. Vinod was treated better is an email that was sent to him by the former chair of the Department of Chemistry, Dr. Netkal Made Gowda (Doc. 77-9 at 5) and a copy of Dr. Vinod's curriculum vitae. (Doc. 77-10 at 42). The Court cannot

consider the email from Dr. Gowda because it is inadmissible hearsay. *See Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 563 (7th Cir. 1998). Here, Dr. Kouassi is relying on a statement that Dr. Gowda made in the email for the truth of the matter asserted in it: that Dr. Vinod was granted tenure on the strength of one article for which he was not a primary author and for which most of the work was done in India. This is quintessential hearsay evidence, and the Court cannot consider it. Dr. Vinod's curriculum vita may not be inadmissible hearsay, as it appears that he drafted it while employed by Western Illinois University, and submitted it as part of a grant application made within the scope of his employment with the University. *See* Fed. R. Evid. 801(d)(2)(D). Even so, the curriculum vitae alone cannot provide all of the evidence that Dr. Kouassi would need it to bear. At the most, it shows that Dr. Vinod was promoted from Assistant Professor to Associate Professor in 2001, and it shows that at the time of his promotion, he had authored four publications, including one that was published after he began his employment at WIU in 1997. (*See* Doc. 77-10 at 42-43).

Dr. Kouassi's evidence with respect to Dr. Scott McConnell is similarly unhelpful. Dr. Kouassi has provided copies of Dr. McConnell's articles and has also produced what he purports to be comments on the Department's decision to promote Dr. McConnell made by Dr. Gowda. (*See* Doc. 79-9 at 2-64). Pursuant to Federal Rule of Evidence 901, a proponent of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Plaintiff has done nothing to authenticate the document with Dr. Gowda's supposed comments, and for that reason the Court must disregard it. *See Devbrow*

*v. Gallegos*, 735 F.3d 584, 586-87 (7th Cir. 2013). In this case, "the most direct method of authentication is a statement from the author or an individual who saw the author compose" the document. *Id.* Plaintiff has not included deposition testimony from Dr. Gowda in which he provides testimony that could authenticate the document, and he has not provided a declaration or affidavit that could serve to authenticate it. Furthermore, Dr. Kouassi has not indicated in any way that he has personal knowledge regarding the document's creation; rather he has testified that Dr. Gowda told him that he had created it and that Dr. Gowda then shared it with him. (*See* Doc. 67-1 at 109-10). Therefore, as with Dr. Vinod, Dr. Kouassi has failed to present evidence that he was similarly situated with Dr. Scott McConnell.

Dr. Kouassi has made a number of arguments in his attempt to show that Defendant retaliated against him. These include evidence of suspicious timing, evidence of ambiguous statements, evidence of pretext, and evidence that similarly situated comparators were treated more favorably than he was. Each argument, independently fails. Therefore, as a whole, the Court concludes that Plaintiff has failed to create the mosaic of circumstantial evidence that is necessary to establish retaliation under the direct method of proof.

### c. Direct Method of Proving Discrimination on the Basis of Race and National Origin

Dr. Kouassi relies upon much of the same evidence that he relied upon to prove retaliation in an attempt to prove that Defendant discriminated against him on the basis of race and national origin. This includes, for example, evidence of pretext and evidence that other professors were treated more favorably. This

evidence cannot support Dr. Kouassi's discrimination claims for the same reasons that it cannot carry his retaliation claims.

Certain other aspects regarding Dr. Kouassi's race and national origin discrimination claims require additional discussion. This includes Dr. Kouassi's evidence that Dr. McConnell made an issue of his accent in reviewing his teaching, and additional arguments regarding suspicious timing.

It is undisputed that Dr. McConnell remarked on Plaintiff's accent in some of her teaching evaluations. In one evaluation, Dr. McConnell observed, "His accent is a little thick at times, but he seems willing to repeat himself several times during the lecture. This helps understanding." (Doc. 77-16 at 67). In another, she noted that, "The class moved at a slow pace and Dr. Kouassi spoke slowly to compensate for his accent (which is understandable but somewhat distracting.)" (*Id.* at 69). It is also undisputed that some of Dr. Kouassi's students, in their evaluations, remarked on difficulties understanding him because of his accent. For example, one student's review from a Fall 2012 class said that Dr. Kouassi's "weakness is that sometimes it is hard to clearly understand him, but its [sic] really not bad." (Doc. 68-3 at 47). Students from a Spring 2012 class noted "his accent makes it hard to understand," that it is "sometimes hard to understand him," and "his strong accent makes it difficult to understand." (*Id.* at 51).

Each of these statements offered by Plaintiff as evidence of animus are statements that have been made in the context of Plaintiff's success as a classroom teacher. It is also undisputed that Defendant must evaluate Dr. Kouassi's teaching and that WIU's professors must possess English proficiency. Moreover, each of these

statements, which relate to difficulties that Dr. Kouassi may have in communicating with his students, are qualified by a recognition of ways in which Dr. Kouassi has or could remedy the difficulties. As the Seventh Circuit has recognized in an analogous situation, it would "take a Herculean leap of logic" to construe these remarks about Dr. Kouassi's accent – one's that were "immediately tempered by an acknowledgment" that Dr. Kouassi has found ways to communicate clearly – as containing any animus based on race or national origin. *See Abuelyaman*, 667 F.3d at 812. Absent other evidence of ambiguous statements regarding Plaintiff's accent that points directly to a discriminatory reason for denying Plaintiff tenure or a PAA, this evidence that Dr. McConnell took note of Plaintiff's accent in her teaching evaluations cannot create a triable issue of fact on Dr. Kouassi's discrimination claim. *See id.*[9]

The Court also must reconsider Plaintiff's evidence regarding suspicious timing. Plaintiff argues that the timing of the Chemistry Department's concern with predatory or vanity publications is circumstantial evidence that Plaintiff's supervisors held a discriminatory animus. Indeed, Plaintiff attempts to create a timeline that shows his department's hostility toward him at each point in which he attempted to advance professionally. For example, he alleges that Dr. McConnell urged him not to apply for a promotion and stated that he was ineligible. Thereafter, however, Dr. McConnell recommended Plaintiff for his promotion and did not inhibit his ability to be promoted. Plaintiff also points to a history of positive

---

[9] As noted above, the Court cannot consider Plaintiff's evidence that Dr. McConnell and Dr. Martinelli-Fernandez stated that Dr. Kouassi could not apply for a promotion until he attended the language center, as Dr. Kouassi has not presented appropriate evidence necessary to support these assertions.

evaluations from the Chemistry Department, and suggests that his evaluations only turned negative after he had been promoted and before he applied for tenure. He observes accurately that certain negative comments made as part of his tenure review directly contradict earlier reviews of his work.

Without more evidence, however, any evidence of suspicious timing in insufficient to create a triable issue as to discrimination. *See Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013). This is especially true when there are reasonable, non-suspicious explanations for the timing of each event, as there are here. *See id.*

To recap: there is unrebutted evidence that the Chemistry Department did not begin to focus on the issue of vanity and predatory publications until after Dr. Kouassi had been reviewed for a promotion to associate professor; there is unrebutted evidence that the Chemistry Department's concern with vanity and predatory publications arose at the same time that other departments at the university began to grow concerned with predatory and vanity publications; and there is unrebutted evidence that another professor in Dr. Kouassi's department, who does not share his race or national origin, was similarly subjected to more searching scrutiny than other professors may have been in the past. Each of these facts is fully consistent with the timing of Defendant's actions and points away from a discriminatory reason for Defendant's actions and toward non-discriminatory reasons for Defendant's actions. Because Plaintiff has failed to produce circumstantial evidence that points directly toward a discriminatory reason for the University's actions, he has failed to create the mosaic of circumstantial evidence

that can be used to establish liability under Title VII. *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

### d. Proving Retaliation and Discrimination Through the Indirect Method

Plaintiff also insinuates that he can prove discrimination and retaliation through the indirect method of proof. Again, to prove a prima facie case for either, Plaintiff must produce evidence that Defendant provided more favorable treatment to other individuals who are similarly situated to him. *See Volovsek*, 344 F.3d at 692. As discussed above, Plaintiff has presented two professors to whom he believes he is similarly situated: Dr. Scott McConnell and Dr. T.K. Vinod. However, also as discussed above, both potential comparators differ from Plaintiff in materially significant ways that make them unsuitable for the task. Without similarly situated comparators, Dr. Kouassi cannot present a prima facie case for either discrimination or retaliation under the indirect method.

.Dr. Kouassi has failed to present evidence that can sustain a prima facie case under the indirect method of proving a Title VII violation, and he has failed to create the mosaic of circumstantial evidence necessary to prove discrimination or retaliation under the direct method. For these reasons, Defendant's motion for summary judgment as to all of Plaintiff's Title VII claims is granted.

### II. Kouassi's Section 1981 Claim Against WIU

Finally, the Court addresses Dr. Kouassi's claim against Defendant brought pursuant to 42 U.S.C. § 1981. Defendant has moved for summary judgment on Plaintiff's § 1981 claim on the ground that it is barred by the Eleventh Amendment. The Eleventh Amendment provides that "[t]he Judicial power of the United States

59

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Despite its language, which is framed in terms of suits filed by citizens of other states, the Supreme Court has distilled from the Eleventh Amendment a general principal: "[A]n unconsenting State is immune from suit brought in federal courts by her own citizens." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This protection extends to a state's agencies or departments. *Id.* Therefore, for purposes of the Eleventh Amendment, Western Illinois University is the State of Illinois. *See Davidson v. Bd. of Governors of State Colls. & Univs. for W. Illinois Univ.*, 920 F.2d 441, 442 (7th Cir. 1990); *see also Rittenhouse v. Bd. of Trustees of S. Illinois Univ.*, 628 F. Supp. 2d 887, 893 (S.D. Ill. 2008) (noting that "the Board [of Southern Illinois University] is a state agency" and is therefore protected by sovereign immunity).

There are situations in which the Eleventh Amendment may not apply to states. *See Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (holding that a state may waive the protections of the Eleventh Amendment by express, unequivocal language); *Bd. of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (Congress may abrogate states' sovereign immunity "when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority."). Neither applies here. It is well established that Congress did not abrogate sovereign immunity when it passed 42 U.S.C. § 1981. *Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999). Moreover, Illinois has not waived its sovereign immunity with respect to § 1981. *See* 745 Ill. Comp. Stat.

5/1. For these reasons, Plaintiff's § 1981 claim is barred by the Eleventh Amendment.

Plaintiff argues that the Eleventh Amendment does not bar claims for injunctive or prospective relief brought against a state, but he is mistaken. The jurisdictional bar of the Eleventh Amendment "applies regardless of the nature of the relief sought" by a plaintiff. *Pennhurst*, 465 U.S. at 100. Contrary to Dr. Kouassi's argument, *Ex Parte Young* does not apply here. Under *Ex Parte Young*, the Eleventh Amendment does not bar suits brought against state officials by plaintiffs seeking prospective equitable relief for ongoing violations of federal law. *See* 209 U.S. 123, 159-60 (1908). Here, however, Plaintiff has not sued a state official. Instead, he has sued an agency of the state. Therefore, the holding of *Ex Parte Young* does not apply. *See Rittenhouse v. Bd. of Trustees of S. Ill. Univ.*, 628 F. Supp. 2d 887, 893 (S.D. Ill. 2008). Plaintiff's § 1981 claim cannot proceed.

## Conclusion

For the foregoing reasons, Plaintiff's motion to strike his deposition transcript (Doc. 81) is DENIED and Defendant's motion for summary judgment (Doc. 66) is GRANTED. CASE TERMINATED.

Entered this 18th day of May, 2015.

s/Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge